IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ILLINOIS DEPARTMENT OF TRANSPORTATION, REGIONAL TRANSPORTATION AUTHORITY, CITY OF CHICAGO, and the CHICAGO TRANSIT AUTHORITY ex rel. RYAN KEISER, | ) ) ) ) ) ) |
| Plaintiff-Relator, | ) ) |
| v. | ) ) ) |
| JAMES McHUGH CONSTRUCTION CO., BRUCE LAKE, MICHAEL GOULD, MATHEW EICHEN, MATHEW BUSH, DAVID KRUEGER, CARLOS DEL VAL CURA, ACCURATE STEEL INSTALLERS, INC., PERDEL CONTRACTING CORPORATION, and ELIZABETH PERINO, | ) ) ) ) ) ) ) |
| Defendants. | ) |

08CV2443
JUDGE DARRAH
MAG. JUDGE NOLAN

## COMPLAINT

NOW COMES the UNITED STATES OF AMERICA, the STATE OF ILLINOIS

DEPARTMENT OF TRANSPORTATION, the ILLINOIS REGIONAL TRANSPORTATION

AUTHORITY, the CITY OF CHICAGO, and the CHICAGO TRANSIT AUTHORITY *ex rel.*

RYAN KEISER, by and through their undersigned attorneys, Loevy & Loevy, and complaining

of Defendants JAMES McHUGH CONSTRUCTION Co., BRUCE LAKE, MICHAEL GOULD,

MATHEW EICHEN, DAVID KRUEGER, CARLOS DEL VAL CURA, MATHEW BUSH,

ACCURATE STEEL INSTALLERS, INC., PERDEL CONTRACTING CORPORATION, and

ELIZABETH PERINO, state as follows:

## I. <u>Introduction</u>

1.    For decades, federal and state governments have worked to promote diversity in the construction industry by requiring government contractors to allocate part of their contract awards to businesses owned by minorities and persons from other traditionally disadvantaged groups (called Disadvantaged Business Enterprises or "DBEs"). The requirements are intended both to prevent race and gender discrimination by prime contractors as well as to foster the growth of qualified DBEs in general by ensuring that they can participate in large government-funded contracts.

2.    Since the requirements were first enacted, they have, unfortunately, been subject to abuse. Unscrupulous prime contractors often try to violate the requirements by using front DBE companies (called "pass throughs") to create the appearance of compliance with the DBE rules when, in fact, the primes are performing the contract work themselves and/or subcontracting portions of it to mainstream non-DBE companies with whom they prefer to work.

3.    This impetus to cheat stems from the fact that doing business with DBEs adds increased expense to government contracts. DBEs are usually smaller companies that cannot provide the efficiencies and economies of scale offered by their more well-established and larger competitors. Nevertheless, that is an expense that the government has chosen to bear as part of a policy to foster DBE growth and it pays a premium in each prime contract award.

4.    By contracting with front DBEs and then actually using their cheaper, non-DBE competitors or the prime's own forces to perform the DBEs' work, the prime contractors can capture these premiums, unfairly increasing their profits.

5.    In addition to the financial motivations to cheat, many prime contractors also harbor a misguided prejudice that DBEs are simply not qualified to perform the work required

2

for large construction projects and that the government's expectations for the prime to use so much DBE work is unrealistic. That belief, like all prejudices, is false.

6.    Even more unfortunate, by continuing the use of pass throughs rather than allowing DBEs to do genuine work and thereby gain experience and grow, the primes are suppressing the development of legitimate DBEs which could fulfil the government's expectations. In other words, the practice of cheating becomes a self-fulfilling prophecy.

7.    One unscrupulous prime contractor that is guilty of DBE cheating is the James P. McHugh Construction Company ("McHugh"). As is explained in greater detail below, McHugh obtained a series of five large public contracts from the Chicago Department of Transportation ("CDOT") and the Chicago Transit Authority ("CTA") worth close to $150 million. These contracts required McHugh to allocate approximately 1/3 of all contract dollars to legitimate DBEs, but McHugh never intended to do so.

8.    Rather, for each contract, McHugh used two front DBEs, Accurate Steel Installers Inc. ("ASI") and Perdel Construction Company Inc. ("Perdel"), to claim almost all of the required DBE credits. Both companies are owned by Defendant Elizabeth Perino, a former nurse, with a pre-existing relationship to McHugh executive Michael Gould.

9.    ASI and Perdel are capable of performing, and routinely do, small-sized construction jobs, usually in the tens of thousands of dollars, and never exceeding the low six figures. ASI has traditionally installed rebar steel as reinforcement in concrete (a process called "rod busting"), while Perdel performs small scale carpentry and concrete work. Neither company has any engineering staff nor any staff capable of pricing (or even scheduling) sophisticated projects.

3

10.     Despite the modest capabilities of these two companies, McHugh fronted ASI and Perdel as DBEs that would handle tens of millions of dollars of structural steel and construction work – work which it was obvious these companies could not perform.

11.     For example, McHugh fronted ASI as its structural steel and tension cable contractor for the North Avenue Bridge ("NAB") contract with CDOT – a $22 million contract with a 34% DBE requirement – despite the fact that ASI had no experience in structural steel or tension cables, much less in bridge building.

12.     McHugh represented in its bid for the NAB project that ASI would be performing some $7 million worth of work as its DBE subcontractor; however, neither McHugh nor ASI ever intended that ASI would actually perform that work and ASI never did perform that work.

13.     Rather, McHugh subcontracted out portions of the work to non-DBE bridge companies and performed other portions of the installation using McHugh employees. Meanwhile, McHugh had ASI create false documentation to make it appear that ASI was managing the project and McHugh literally hung an ASI logo over its own McHugh-marked cranes to create the appearance for on-site inspectors that ASI was performing the work.

14.     Relator, Ryan Keiser, possesses copious documents and pictures showing this scam and numerous others that McHugh used to create the false appearance that it was complying with its DBE undertakings when it was just using ASI/Perdel as fronts in contract after contract.

15.     Mr. Keiser worked as a project manager for Defendant Perino. Indeed, he was her sole project manager for both ASI and Perdel at three major construction sites: NAB (where ASI/Perdel were allocated $8.2 million worth of work), the CTA Brown Line reconstruction (where ASI/Perdel were allocated $15 millions worth of work), and the CTA Red Line

4

reconstruction (where ASI/Perdel were allocated $13.6 millions worth of work).

16.     In any normally-functioning environment, Perino would have needed a separate project manager for each company at each of those sites. The fact that Mr. Keiser was assigned a scope of work that would normally have gone to six different managers is a telling measure of how ASI and Perdel were merely operating as shells for McHugh.

17.     Indeed, the pass through nature of the McHugh-ASI/Perdel relationship was plain from the tasks that the McHugh employees expected Mr. Keiser to perform. Rather than involving him in meaningful work scheduling and oversight, McHugh would require Keiser to rubber stamp contracts that McHugh negotiated with second tier subcontractors, pass through invoices for which McHugh wanted DBE credit, and to not ask too many questions.

18.     All told, McHugh diverted approximately $40 million worth of work that the government intended for legitimate DBE companies but which McHugh performed itself and passed through to non-DBE contractors.

19.     This massive diversion of taxpayer monies was accomplished by fraud. McHugh knew that ASI/Perdel could not handle the tens of millions of dollars of sophisticated work allocated to it in McHugh's bids and that McHugh would in fact be managing the work. Nevertheless, in order to obtain the contracts, both McHugh and Perino certified in McHugh's bids that ASI/Perdel would be performing the work. Moreover, throughout the life of the contracts they created false documentation to conceal the fact that ASI/Perdel were merely pass throughs, and they made monthly false certifications to claim DBE credit for work that ASI/Perdel did not actually perform.

20.     McHugh used this scam in five major construction contracts over a two-year period: NAB; two additional CDOT contracts, one for the 90/94 viaduct at Washington and

Monroe, and one for the 33rd Street viaduct; and, the CTA Brown Line and Red Line contracts,.

21.     The fraudulent statements made to obtain these contracts and the and false claims in the performance of them, all violate the federal False Claims Act, 31 U.S.C. § 3729 et seq. ("FCA"), the State of Illinois' Whistleblower Reward and Protection Act, 740 ILCS 175/1 et seq., and City of Chicago Ordinance 1-22-10 *et seq.*  Relator seeks a recovery herein of treble damages and penalties pursuant to each of those laws to obtain justice from McHugh and the other defendants, as well as to discourage future abuses in DBE programs.

## II.  Jurisdiction and Venue

22.     The Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1367 and 31 U.S.C. § 3730.  Mr. Keiser has direct and independent knowledge of the information on which the allegations are based and he voluntarily provided the information to the government before filing these claims.  Further, the allegations and transactions upon which this action is based have not been publicly disclosed.   Relator's state law claims are transactionally related to his personal FCA claims and those he raises on behalf of the government.

23.     Venue is proper pursuant to 31 U.S.C. § 3732.  All Defendants transact business in this judicial district and the claims are based on events that occurred here.  Moreover, most if not all of the Defendants reside and/or maintain their principal place of business here.

## III.  Parties

24.     Defendant McHugh is a business corporation organized under the laws of the State of Illinois, with its principal place of business in Chicago, Illinois.  McHugh Enterprises Inc. owns 100% of the shares of McHugh.  McHugh is a major heavy construction and infrastructure firm, responsible for billions of dollars worth of government and private construction projects.  Its gross revenues in 2007 alone exceeded $500 million.

6

25.     Defendant Bruce Lake is the President of Defendant McHugh. Among other false claims for which he is responsible, Defendant Lake executed the false bid certifications regarding ASI/Perdel knowing those statements to be false.

26.     Defendant Michael Gould is a vice president of McHugh. He conceived of and implemented the use of ASI/Perdel as pass throughs on the CDOT and CTA contracts subject of this action. He also directed the McHugh Project Managers at each site to use ASI/Perdel as pass throughs.

27.     Defendant David "Dave" Krueger was the McHugh Project Manager for the CTA Brown Line contract. Krueger oversaw and implemented the use of ASI/Perdel as pass through DBEs on that contract.

28.     Defendant Carlos Del Val Cura was the McHugh Project Manager for North Avenue Bridge. Del Val Cura oversaw and implemented the use of ASI/Perdel as pass through DBEs on this contract.

29.     Defendant Matthew Eichen was the McHugh Project Manager for the CTA Red Line contract. Eichen oversaw and implemented the use of ASI/Perdel as pass through DBEs on that contract.

30.     Defendant Matthew Bush was the McHugh Executive Project Manager over Krueger and Eichen. He directed and approved their use of ASI/ Perdel oversaw and implemented the use of ASI/Perdel as pass through DBEs on that contract.

31.     Defendants ASI and Perdel are both Illinois corporations with their principal places of business located at the same office in Lockport Illinois. Defendant Perino is the owner and president of both companies.

7

## IV. The DBE Requirements

32.     All five contracts at issue in this suit were funded at least in part by the federal Department of Transportation ("DOT"). Federal highway funds were used for the three CDOT contracts and federal transit funds were used for the CTA contracts. Accordingly, each contract was subject to the DOT rules set out in 49 CFR § 26.55 regarding DBE usage. These rules were incorporated into McHugh's bids and the final contracts it received.

33.     These DOT rules are intended to prevent the use of pass through entities to satisfy the DBE requirements. The rules contain numerous requirements towards that end. The primary requirements are summarized as follows:

34.     First, the DBE must perform a "commercially useful function." The rules contemplate that the DBE will be a functioning business with a legitimate subcontractor relationship to the prime contractor, such that the DBE is not acting merely as a shell. The DBE must actually perform, supervise and manage the work allocated to it in the bid and prime contract. It must also determine the quantities and qualities of the materials needed for the work, negotiate for its own supplies and materials, and install the materials itself. A DBE does not perform a commercially useful function if its role is limited to that of an extra participant in a transaction negotiated by the prime contractor.

35.     ASI/Perdel did not perform a commercially useful function; they were incapable of doing the type of work allocated to them in the contracts and McHugh handled the work itself. For example, McHugh would negotiate directly with suppliers for the structural steel that was needed for the five contracts and then have ASI issue purchase orders for the contracts McHugh had negotiated. McHugh, and not ASI, would then install these items.

8

36.     Among the numerous instances of this type of scam was a $2 million contract with Advanced Iron Works ("AIW") for structural steel for the Red Line contract. As is explained in greater detail below, Relator possesses documentation showing how McHugh negotiated the contract with Advanced then had ASI issue the contract in its own name. Moreover, the paperwork shows how McHugh negotiated with Advanced for later change orders on the contract even after it was issued in ASI's name.

37.     A second requirement prevents the prime contractor from claiming DBE credit for subcontracted work unless the work is being performed by the DBE's own forces. While supplies and materials obtained by a DBE for use in its work may be counted towards the goal, they do not count if the DBE does not use those supplies or install those materials itself. Thus, the prime contractor cannot satisfy its DBE obligations by having a DBE order supplies and materials for the prime contractor's operations. Similarly, work which the DBE subcontracts to other non-DBE companies does not count towards DBE goals.

38.     Defendants consistently violated this rule. For example, on the Brown Line contract, McHugh counted millions of dollars worth of structural steel, like platforms and supports for the elevated railway, which was ordered through ASI but which ASI lacked the skill and expertise to actually install. Rather, this steel was installed by McHugh employees and other subcontractors. McHugh also transferred one of its own foreman, Bobby Bass, to ASI's payroll to manage the work and then transferred him back to McHugh once the work was completed. It shuffled Mr. Bass between McHugh's and ASI's payrolls on numerous occasions, not only on the Brown Line contract, but on North Avenue Bridge and the other contracts as well.

39.     Finally, all amounts to be counted towards DBE participation must have been actually paid to the DBE. Defendants violated this requirement as most of the monies paid to

9

ASI were being passed through to other entities and passed back to McHugh.

40.     In addition to the forgoing DOT requirement, both CDOT and CTA include an "area of specialty" requirement, such that the prime contractor can only claim credit for work by a DBE within its certified area of specialty. For example, ASI was certified by IDOT as being specialized in "Steel, Reinforcing (Rebar Placement)," which is a very different specialty than structural steel. Nevertheless, the vast bulk of the work which McHugh contracted to ASI (either directly or through Perdel) was for procuring and installing structural steel. ASI lacked the expertise to do such work, and McHugh in fact did those installations while claiming DBE credit for structural steel work and materials ordered through ASI .

41.     Violation of the DBE requirements is a material breach of all five contracts, entitling the CDOT and CTA, respectively, to suspend or terminate the contracts and to disbar the prime contractor, Defendant McHugh.

42.     Finally, the CDOT contracts include a liquidated damages provision for DBE violations. Specifically, for each one percent of shortfall towards the DBE contract participation goal, damages are equal to one percent of the total base price of the contract.

## V. Fraudulent Inducement of the Contracts

43.     McHugh used ASI and Perdel to cover almost all of the DBE utilization requirements in its bids for five prime contracts. The schedule of work allocated to ASI/Perdel in these bids was far outside of their expertise. McHugh was fully aware of this fact and it never intended to use ASI/Perdel to perform the work.

44.     For example, ASI was certified as a DBE for reinforcing steel, *i.e.* rebar work (or "rod busting"), but McHugh used it for structural steel, a very different specialty which requires a far greater level of expertise than rod busting. Similarly, Perdel's DBE certification was for

10

general concrete, but McHugh allocated it expensive paving contracts, sophisticated foundation work, and even used it as a "general contractor" for almost $18 million worth of work.

45.     The prior job history of ASI/Perdel, which consisted of small, straightforward, contracting work, as well as their limited areas of certification, show that McHugh could not possibly have expected the companies to perform the work it was allocating to them in its bids.

46.     Morever, the timing of the five bids belies any claim that McHugh did not know that ASI/Perdel were incapable of performing the work schedule and did not intend to take over that work itself. Specifically, McHugh bid on these contracts over the course of two years. Thus, McHugh was already performing the earlier contracts (and doing ASI/Perdel's work schedule itself) at the time it submitted the later bids. Nevertheless, it continued to use ASI/Perdel in its bids for millions of dollars worth of DBE work that the companies could not do and, in fact, were not doing on the earlier contracts.

47.     The five fraudulently-induced prime contracts are as follows:

### CDOT Washington/Monroe I-90/94 Overpass Contract

48.     The first contract McHugh bid on using ASI and Perdel for its DBE credit was the CDOT contract for the Washington/Monroe I-90/94 Overpass project. McHugh submitted its bid on the project in approximately January of 2005. Based on McHugh's representations in its bid, the City of Chicago awarded it the contract on May 18, 2005.

49.     The overpass contract was for a total sum of $9,440,105.33. With change orders and adjustments, the contract price eventually rose to $9,776,030.72. The Federal Highway Administration provided funds for the project.

50.     The solicitation and final contract contained a requirement that 31% of the contract price would be spent with *bona fide* DBE businesses. McHugh stated in its bid that it

11

intended to fulfill the entire 31% using ASI and Perdel.

51.     On December 21, 2004, Defendant Elizabeth Perino, executed two "Schedule C" letters of intent, one on behalf of Perdel and the other on behalf of ASI. For Perdel, Perino affirmed that Perdel was prepared to perform $628,529.00 of specified work on the overpass contract and would not be subcontracting out any of the work. For ASI, Perino affirmed that ASI was prepared to perform $2.3 million of specified work on the overpass contract and would not be subcontracting out any of the work.

52.     The Schedule C attachments listed the work each company was to perform. For Perdel, most of the dollar value of the work ($550,000 for paving and protective shielding) was outside of Perdel's competency. Similarly most of the dollar value of the work scheduled for ASI was outside of its competency (approximately $1.8 million for erecting steel, fabricating steel fascia, and bearing assembly work). Neither ASI/Perdel nor McHugh contemplated that the companies would actually perform this work.

53.     Rather, it was contemplated by both ASI/Perdel and McHugh that most of the work would be performed by McHugh employees and other subcontractors with sufficient expertise. ASI/Perdel and McHugh planned to and did pass the employees' payroll and the subcontractors' bills through ASI to create the appearance that ASI was performing this work when in fact it was not.

54.     Defendant McHugh submitted these two Schedule Cs in support of its bid as well as a "Schedule D Affidavit of Prime Contractor" in which it affirmed "[t]o the best of my knowledge, information and belief the facts and representation contained in the aforementioned attached Schedules are true, and no material facts have been omitted."

12

55.     The Schedule Cs and Schedule D were false and fraudulent because ASI/Perdel could not perform most of the work that was allocated to them on the Schedule Cs and neither ASI/Perdel nor McHugh contemplated they would perform that work. The Schedule Cs were also fraudulent because ASI/Perdel and McHugh contemplated that ASI/Perdel would subcontract out the work but represented there would be no subcontracting.

56.     The false Schedule D verification was executed by Defendant Bruce Lake who knew and/or recklessly failed to discover that it was false.

57.     Both the Schedule Cs and the Schedule D were expressly required to obtain the contract such that failure to submit them and make the certification of truth and completeness would result in the bid being rejected.

58.     Also with its bid, McHugh submitted an "Economic Disclosure Statement and Affidavit" in which it falsely stated that it did not intend to retain any subcontractors to perform the work listed under the ASI and Perdel Schedule Cs when, in fact, it knew that ASI and Perdel could not perform the listed work and that McHugh did anticipate retaining other subcontractors that were capable of performing some of the work and whose bills it intended to pass through ASI and Perdel. The false disclosure was executed by Defendant Bruce Lake who knew and/or recklessly failed to discover that it was false.

59.     The false disclosure was expressly required to obtain the contract such that failure to submit it would result in the bid being rejected..

60.     McHugh renewed this same false statement each of the 19 times it executed a change order on the contract.

61.     Pursuant to the terms of the overpass contract, McHugh was required to and did submit monthly "Status Report of DBE Contract Payments" Forms (also known as DBE

Utilization Reports) covering ASI and Perdel, which stated how much DBE work, in dollars, the entities had performed. These reports were submitted to CDOT with each monthly McHugh invoice and were necessary to get the invoice paid.

62.     Each of these forms were used fraudulently to create the impression that ASI and Perdel were performing the work that they had specified in their Schedule Cs and for McHugh to claim DBE credit towards its 31% requirement when, in fact, much of the listed work was being performed by McHugh itself and other vendors that McHugh hired and then passed through ASI and Perdel. Each of these reports was executed under penalty of perjury by agents acting on behalf of McHugh.

63.     The requirements of the contract also specified that each of the forgoing false statements would be considered a certification. The bid and contract expressly provided that by "signing the Contract, you certify or affirm the truthfulness and accuracy of any statement you have made, you make, or you may make pertaining to the Contract, including any invoice for your services."

### *CTA Red Line Contract*

64.     The next contract McHugh bid using ASI/Perdel for its DBE credit was the CTA Howard Red Line station contract. McHugh bid on this contract in approximately November of 2005. CTA accepted the bid and awarded McHugh the contract on February 16, 2006.

65.     The Red Line contract was for a total sum of $56,750,000 million. With change orders, the contract price eventually rose to $58,840,353.36. The contract was funded by the Federal Transportation Administration, the Illinois Department of Transportation, the Regional Transportation Authority, and the CTA.

14

66.     The solicitation and final contract contained a requirement that 30% of the contract price would be spent with *bona fide* DBE/Women-owned businesses.  McHugh stated in its bid that it intended to fulfill the entire 30% ($17.1 million) using three companies, including Perdel.  The lion's share of the DBE business, $13.6 million, was allocated to Perdel in the bid.

67.     On November 9, 2005, Defendant Elizabeth Perino, executed a "Schedule C" letter of intent on behalf of Defendant Perdel, affirming that Perdel was prepared to perform $13,600,000 of "general contracting" work on the Red Line contract and would be subcontracting out 30% of its work (a limit past which greater disclosures are required) to other DBE contractors.

68.     The Schedule C was false and fraudulent.  Perdel was not capable of performing the general contracting work and it was not contemplated by Perdel or McHugh that Perdel would actually perform that work.

69.     Rather, it was contemplated by both Perdel and McHugh that most of the work would be performed by McHugh employees and other non-DBE subcontractors with sufficient expertise.  Also it was contemplated that the 30% would be going to non-DBEs.  Perdel and McHugh planned to and did pass the employees' payroll and the subcontractors' bills through Perdel to create the appearance that Perdel was performing this work and acting as a general contractor when in fact it was not.

70.     Defendant McHugh submitted this Schedule C in support of its bid as well as a Schedule D "DBE Utilization Plan" stating that it would contract with Perdel to perform concrete work and general contracting in the amount of $13.6 million. The Schedule D further contained an "Affidavit of Prime Contractor" in which it affirmed "[t]o the best of my knowledge, information and belief the facts and representation contained in the aforementioned attached

15

Schedules are true, and no material facts have been omitted."

71.     The Schedule C and Schedule D were false and fraudulent because Perdel could not perform most of the work that was allocated to it on the Schedule C and neither Perdel nor McHugh contemplated it would perform that work. The Schedule C was also fraudulent because Perdel and McHugh contemplated that ASI/Perdel would subcontract out the 30% to non-DBEs.

72.     The false verification was executed by Defendant Bruce Lake who knew and/or recklessly failed to discover that it was false.

73.     Both the Schedule C and the Schedule D were expressly required to obtain the contract such that failure to submit them and make the certification of truth and completeness would result in the bid being rejected.

74.     Defendant McHugh was further required to and did submit to the CTA periodic "Status Reports of DBE Subcontractor Payments" as well as original invoices of the DBE subcontractors in order to receive payment. These document from and about Perdel were false and fraudulent in that they indicated that monies were being paid to Perdel when in fact they were being passed through to non-DBE companies. Similarly, the Perdel invoices were false in that they indicated Perdel was performing work which was actually being performed by others including McHugh.

*CDOT North Avenue Bridge Contract*

75.     The next contract McHugh bid on using ASI and Perdel for its DBE credit was the North Avenue Bridge ("NAB") contract. McHugh submitted its bid in January of 2006, executed by its President, Defendant Bruce Lake. Based on McHugh's representations, its bid was accepted by IDOT on April 26, 2006 and by the CDOT on April 27, 2006.

16

76. The contract was for a total sum of $19,298,295.00. With change orders, the price increased to $22,621,444.84. The Federal Highway Administration provided funds for the project.

77. The NAB contract solicitation and contract contained a requirement that 34% of the contract price would be spent with *bona fide* DBE businesses. McHugh stated in its bid that it intended to fulfill the entire 34% using ASI and Perdel.

78. On January 31, 2006, Defendant Elizabeth Perino, executed a "Schedule C: Letter of Intent" indicating that ASI was prepared to perform $5.1 million of specified work on the NAB contract and would not be subcontracting out any of the specified work to DBE or non-DBE contractors. The ASI contract price was later increased to over $7 million via change orders.

79. The Schedule C attachment listed the work ASI was to perform. It contains numerous items that ASI had no ability to perform and which neither ASI nor McHugh contemplated ASI would actually perform. For example the attachment indicated that ASI would erect the structural steel and install the suspension cable and cable stay systems for the bridge, all of which is specialized work that ASI had never performed and which it lacked the expertise, staff, and equipment to perform. Essentially, the only item of work listed in the attachment which ASI could perform was the installation of reinforcement steel, a relatively small portion of the work accounting for approximately ten percent of the over $5 million ASI subcontract.

80. Rather, it was contemplated by both ASI and McHugh that most of the work would be performed by McHugh employees and other subcontractors with sufficient expertise and whose bills would be passed through ASI.

17

81.     Also on January 31, 2006, Defendant Elizabeth Perino, executed a "Schedule C: Letter of Intent" indicating that Perdel was prepared to perform $1.6 million of specified work on the NAB contract and would not be subcontracting out any of the specified work to DBE or non-DBE contractors.

82.     The Schedule C attachment listed the work Perdel was to perform. While most of the listed items were within Perdel's competency to perform, most of the dollar value of the contract was for two large items which were outside of Perdel's competency and which neither Perdel nor McHugh contemplated Perdel would actually perform. Specifically, the contract allocated $410,000 for the installation of concrete structures and $970,000 for the creation of a temporary bridge. Perdel lacked the expertise to perform these projects.

83.     Rather, it was contemplated by both Perdel and McHugh that most of the work would be performed by McHugh employees and other subcontractors with sufficient expertise and whose bills would be passed through Perdel.

84.     Defendant McHugh submitted these two Schedule Cs in support of its bid as well as a "Schedule D" verification, also dated January 31, 2006, in which it falsely affirmed "[t]o the best of my knowledge, information and belief the facts and representation contained in the aforementioned attached Schedules are true, and no material facts have been omitted."

85.     The Schedule Cs and Schedule D were false and fraudulent because ASI/Perdel could not perform most of the work that was allocated to them on the Schedule Cs and neither ASI/Perdel nor McHugh contemplated they would perform that work. The Schedule Cs were also fraudulent because ASI/Perdel and McHugh contemplated that ASI/Perdel would subcontract out the work but represented there would be no subcontracting.

18

86.     The false verification was executed by Defendant Bruce Lake who knew and/or recklessly failed to discover that it was false.

87.     Both the Schedule Cs and the Schedule D were expressly required to obtain the contract such that failure to submit them and make the certification of truth and completeness would result in the bid being rejected.

88.     Also with its bid, McHugh submitted an "Economic Disclosure Statement and Affidavit" in which it falsely stated that it did not intend to retain any subcontractors to perform the work listed under the ASI and Perdel Schedule Cs when, in fact, it knew that ASI and Perdel could not perform the listed work and that McHugh did anticipate retaining other subcontractors that were capable of performing the work and whose bills it intended to pass through ASI and Perdel. The false disclosure was executed by Defendant Bruce Lake.

89.     The false disclosure was expressly required to obtain the contract such that failure to submit it would result in the bid being rejected.

90.     McHugh renewed this same false statement each time it executed a change order on the contract.

91.     Pursuant to the terms of the NAB contract, McHugh was required to and did submit monthly DBE Utilization Reports covering ASI and Perdel, which stated how much DBE work, in dollars, the entities had performed. These reports were submitted to CDOT with each monthly McHugh invoice and were necessary to get the invoice paid. Each of these forms were used fraudulently to create the impression that ASI and Perdel were performing the work that they had specified in their Form Cs and for McHugh to claim DBE credit towards its 34% requirement when, in fact, the listed work was being performed by McHugh itself and other vendors that McHugh hired and then passed through ASI and Perdel. Each of these reports was

executed under penalty of perjury by agents acting on behalf of McHugh.

### 33rd Street Viaduct Contract

92.     The next contract McHugh bid on using ASI/Perdel for DBE credit was the 33rd

Street Viaduct over the Dan Ryan. McHugh submitted its bid on May 3, 2006, executed by its

President, Defendant Bruce Lake. Based on McHugh's representations, its bid was accepted by

IDOT on June 7, 2006 and by CDOT on July 28, 2006.

93.     The contract was for a total sum of $6,367,157.00. With change orders and

adjustments, the contract is currently priced at $6,202,402.00. The Federal Highway

Administration was the source of funds for the project.

94.     The 33rd Street Viaduct contract solicitation and contract contained a requirement

that 40% of the contract price would be spent with bona fide DBE businesses. McHugh stated in

its bid that it intended to use Perdel for over $700,000 of the work, and McHugh later increased

the sum through change orders.

95.     Unlike with the other contracts at issue in this case, most of the DBE work in the

bid was allocated to DBEs other than Perino's companies. Nevertheless, McHugh still used

Perdel as a pass through and claimed DBE credit for work which Perdel did not perform (and

which it lacked the expertise to perform).

96.     On May 3, 2006, Defendant Elizabeth Perino, executed a "Schedule C: Letter of

Intent" indicating that Perdel was prepared to perform $738,018 of specified work on the viaduct

contract and that it would not be subcontracting out any of the specified work to DBE or non-

DBE contractors.

97.     The Schedule C listed the work Perdel was to perform. The bulk of it,

approximately $650,000 worth, was work which Perdel lacked the expertise to carry out.

Specifically, most of the schedule involved complicated concrete pours which require special engineering abilities and experience that Perdel did not have. Neither Perdel nor McHugh contemplated that Perdel would actually carry out the work and Perdel never did perform this work. Rather, McHugh performed this pour using its own employees.

98.     Defendant McHugh submitted the Perdel Schedule C in support of its bid as well as a "Schedule D" verification, also dated May 3, 2006, in which McHugh falsely affirmed "[t]o the best of my knowledge, information and belief the facts and representation contained in the aforementioned attached Schedules are true, and no material facts have been omitted."

99.     The Schedule C and Schedule D were false and fraudulent because ASI/Perdel could not perform most of the work that was allocated to them on the Schedule C and neither ASI/Perdel nor McHugh contemplated they would perform that work. The Schedule C was also fraudulent because ASI/Perdel and McHugh contemplated that ASI/Perdel would subcontract out the work but represented there would be no subcontracting.

100.    The false verification was executed by Defendant Bruce Lake who knew and/or recklessly failed to discover that it was false.

101.    Both the Schedule C and the Schedule D were expressly required to obtain the contract such that failure to submit them and make the certification of truth and completeness would result in the bid being rejected.

102.    Also with its bid, McHugh submitted an "Economic Disclosure Statement and Affidavit" in which it falsely stated that it did not intend to retain any subcontractors to perform the work listed under the Perdel Schedule C when, in fact, it knew that Perdel could not perform the listed work and that McHugh did anticipate retaining other subcontractors that were capable of performing the work and whose bills it intended to pass through Perdel. The false disclosure

21

was executed by Defendant Bruce Lake.

103.    The false disclosure was expressly required to obtain the contract such that failure
to submit it would result in the bid being rejected.

104.    McHugh renewed this same false statement each time it executed a change order
on the contract.

105.    Pursuant to the terms of the contract, McHugh was required to and did submit
monthly DBE Utilization Reports covering Perdel, which stated how much DBE work, in dollars,
it had performed. These reports were submitted to CDOT with each monthly McHugh invoice
and were necessary to get the invoice paid. Each of these forms were used fraudulently to create
the impression that Perdel was performing the work that specified in the Schedule Cs and for
McHugh to claim DBE credit towards its 40% requirement when, in fact, the listed work was
being performed by McHugh itself and other vendors that McHugh hired and then passed
through Perdel. Each of these reports was executed under penalty of perjury by agents acting on
behalf of McHugh.

### *CTA Brown Line Contract*

106.    In June of 2006, McHugh submitted a bid to CTA for the Brown Line expansion
contract using ASI and Perdel for most of its DBE credit. McHugh submitted its bid on June 15,
2006, executed by its President, Defendant Bruce Lake. CTA accepted the bid and awarded
McHugh the contract on September 12, 2006.

107.    The Brown Line contract was for a total sum of $58,385,000. The contract was
funded by the Federal Transportation Administration, the Illinois Department of Transportation,
the Regional Transportation Authority, and the CTA.

108.    The solicitation and final contract contained a requirement that 30% of the contract price would be spent with bona fide DBE/Women-owned businesses. McHugh stated in its bid that it intended to fulfill the entire requirement using five DBE businesses including ASI and Perdel. ASI and Perdel received the lion's share of the DBE business. They were allotted $10,750,000 and $4,358,500, respectively.

109.    On June 14, 2006, Defendant Elizabeth Perino, a executed "Schedule C" letter of intent on behalf of Defendant Perdel, affirming that Perdel was prepared to perform $4,358,500 of "concrete and misc. work" on the Brown Line contract and would not be subcontracting out any of its work to other DBE or non-DBE contractors.

110.    The Schedule C was false and fraudulent. Perdel was not capable of performing over $4 million worth of work on the project and it was not contemplated by Perdel or McHugh that Perdel would actually perform that work.

111.    Rather, it was contemplated by both Perdel and McHugh that most of the work would be performed by McHugh employees and other non-DBE subcontractors with sufficient expertise. Perdel and McHugh planned to and did pass the employees' payroll and the subcontractors' bills through Perdel to create the appearance that Perdel was performing this work when in fact it was not.

112.    On June 14, 2006, Defendant Elizabeth Perino, a executed "Schedule C" letter of intent on behalf of Defendant ASI, affirming that ASI was prepared to perform $10,750,000 of structural steel work on the Brown Line contract and would not be subcontracting out any of its work to other DBE or non-DBE contractors.

113.    The Schedule C was false and fraudulent. ASI was not capable of performing the needed structural steel work on the project and it was not contemplated by ASI or McHugh that

23

ASI would actually perform that work.

114.    Rather, it was contemplated by both ASI and McHugh that most of the work would be performed by McHugh employees and other non-DBE subcontractors with sufficient expertise. ASI and McHugh planned to and did pass the employees' payroll and the subcontractors' bills through ASI to create the appearance that ASI was performing this work when in fact it was not.

115.    Defendant McHugh submitted these Schedule Cs in support of its bid as well as a Schedule D "DBE Utilization Plan" stating that it would contract with Perdel and ASI to perform concrete work and general contracting in the amount of $15,108,500. The Schedule D further contained an "Affidavit of Prime Contractor" in which it affirmed "[t]o the best of my knowledge, information and belief the facts and representation contained in the aforementioned attached Schedules are true, and no material facts have been omitted."

116.    The Schedule Cs and Schedule D were false and fraudulent because ASI/Perdel could not perform most of the work that was allocated to them on the Schedule Cs and neither ASI/Perdel nor McHugh contemplated they would perform that work. The Schedule Cs were also fraudulent because ASI/Perdel and McHugh contemplated that ASI/Perdel would subcontract out the work but represented there would be no subcontracting.

117.    The false verification was executed by Defendant Bruce Lake who knew and/or recklessly failed to discover that it was false.

118.    Both the Schedule C and the Schedule D were expressly required to obtain the contract such that failure to submit them and make the certification of truth and completeness would result in the bid being rejected.

24

119.    Defendant McHugh was further required to and did submit to the CTA periodic "Status Reports of DBE Subcontractor Payments" as well as original invoices of the DBE subcontractors in order to receive payment. These document from and about Perdel were false and fraudulent in that they indicated that monies were being paid to Perdel when in fact they were being passed through to non-DBE companies. Similarly, the Perdel invoices were false in that they indicated Perdel was performing work which it was actually being performed by others including McHugh.

## VI. Example DBE Violations By McHugh and ASI/Perdel

120.    McHugh's use of ASI/Perdel as front DBEs was a pervasive problem across all of the contracts on which it used those entities to claim its DBE credit. McHugh's misuse of the companies caused it to regularly run afoul of the rules, sometimes many times per day, and thereby improperly claim DBE credit for non-compliant work. The following are intended as examples to demonstrate the types of violations and how McHugh's fraud worked.

121.    As previously explained, DOT rules prevent the use of pass through DBEs by imposing a number of requirements. One such requirement is that DBEs must determine the necessary materials, negotiate for them, and purchase the materials themselves.

122.    Because ASI/Perdel were not actually performing the work allocated to them and lacked the experience to do it, McHugh routinely negotiated contracts with suppliers and then instructed ASI to issue purchase orders to the suppliers.

123.    For example, during construction on the NAB project, McHugh needed a steel bridge span for the temporary bridge. McHugh negotiated to lease the span directly with a company called Acrow Bridge, agreeing to a contract worth approximately $60,000.00. As is reflected in Defendant Gould's July 14, 2006 email to Defendant Del Cura, Defendant Perino

and Acrow employees Bill Keenan and Eugene Sobecki, McHugh then passed the contract through ASI. In the email, Gould instructs Keenan and Sobecki to forward a clean copy of the lease prepared for ASI's signature and states that McHugh would be providing Acrow a guarantee of payment by ASI.

124. This guarantee was provided to Acrow after it learned that McHugh expected it to contract with ASI as a pass through and balked at extending credit to ASI. Such guarantees are a hallmark sign that DBEs are mere pass-throughs. That same day Defendant Del Val Cura wrote an email to Perino instructing her to execute the lease.

125. In similar fashion, when it came time to ship the Acrow temporary span to the NAB site, McHugh negotiated a barge contract directly with the shipping company and then instructed ASI to issue the purchase order in its own name. This is reflected in an email from McHugh's assistant project manager for NAB, Peggy Blaney, to Defendant Perino, dated August 18, 2006, stating: "In order to move the barge for the temporary bridge center span – we need to use Holly Marine Towing, Inc. Mike Gould would like Accurate Steel to issue this P.O. to Holly Marine. Information on the rental charges is in the email below. . . . Please issue a P.O.. . ." Blaney's email forwarded an email from Holly to Defendant Gould reflecting their negotiations for the rental and containing Holly's proposal for McHugh.

126. Additional examples, among may others, of McHugh negotiating for materials and then having ASI act as a pass through include, but are not limited to:

        A.     The contract with ACME Structural for $730,000 worth of structural steel.

        B.     The $8,000 contract with Con-Serv Inc. for bridge bearings.

        C.     The $216,000 contract with Advanced Iron Works for structural steel for the temporary bridge at NAB.

D.      The $2 million contract with AIW for structural steel for the Red Line

contract as well as the change orders under that contract, all of which were negotiated and

controlled by Defendant De Val Cura.

E.      A $46,000 contract with Forming Concepts Inc.

F.      A $100,000 contract with Flatiron, Constructors Inc. for a lifting truss

system for the NAB contract. Defendant De Val Cura negotiated with Flatiron and then had ASI

issue the purchase order.

G.      A $2.5 million contract with Munster Steel Co., Inc., for platform steel for

the Brown Line.

H.      A $108,000 contract with Sugar Steel for structural steel for the Brown

Line; and,

I.      A $1 million contract with Clodfelter Bridge and Structures International

for suspension cables. As the 9/12/06 fax to ASI demonstrates, this agreement was negotiated

between Clodfelter and McHugh and Clodfelter knew ASI was serving only as a passthrough.

127.    Relatedly, prime contractors are forbidden to claim DBE credit for materials and

supplies purchased by a DBE unless those materials and supplies were actually used by the DBEs

own forces to carry out its scheduled work. McHugh ignored this requirement. This is true of

the materials contracts for which McHugh handled the negotiations.

128.    For example, ASI could not and did not install the lifting truss which Defendant

De Val Cura had ASI purchase from Flatiron. Rather, the truss was installed by McHugh. This

is documented in a series of webcam photographs showing the initial use of a McHugh-marked

crane to place the truss. Later during the project McHugh hung a fake ASI sign over the

McHugh markings on the side of the crane facing the webcam. However, as the crane turned

27

days later to complete the project, the uncovered McHugh marking on the opposite side of the crane can still be seen.

129.     An additional example, among many, where McHugh handled the installation of items purchased through ASI/Perdel was the cable stay and post-tensioning systems for the NAB. McHugh had ASI purchase these items from a company called Dywidag Systems International USA Inc. ("DSI") after McHugh had negotiated with DSI over the contract. These items totaled approximately $400,000. Although the contract bid which McHugh submitted to CDOT indicated that ASI would be performing over $850,000 of labor to install these items, ASI had no ability to do so and in fact McHugh handled these installations. McHugh also created and submitted false DBE reports stating that ASI did perform the installations.

130.     When it came time for these items to be installed, McHugh transferred its ironwork foreman, Bobby Bass, and his crew from its contract building the Trump Tower, and placed them on ASI's payroll. When that phase was done, it transferred these employees back to McHugh's payroll. McHugh did so because no one at ASI had the expertise or experience to perform these complicated installations, which was true of most of the other work allocated to it.

131.     Even for items which ASI/Perdel could have handled on their own, McHugh often did the work itself and simply claimed credit by ordering the materials through ASI/ Perdel.

132.     Another way in which McHugh claimed DBE credit for purchases through ASI/Perdel was by having Perdel be the entity that rented the office space and job trailers for McHugh and all of the contractors at each of the sites. Because ASI/Perdel were essentially non-functioning pass-throughs, they had little if any need for office space and did not use it. In fact all that ASI/Perdel had of the space was one small desk crammed into a corner next to a refrigerator. This was an unusable space that in fact went used. Meanwhile, McHugh and other

28

contractors had the run of the office.

133.    A final example of how McHugh controlled ASI/Perdel, such that these

companies did not perform a commercially useful function, is that McHugh dictated the hiring

and staffing decisions for the companies. When McHugh would perform work which had been

allocated to ASI/Perdel (which was most such work) it would hire workers from the union hall

and simply inform ASI/Perdel to issue paychecks to these workers. McHugh would use this

system even for relatively unskilled labor positions. In total, only approximately three percent of

the work scheduled to ASI/Perdel were performed by actual ASI/Perdel employees and these

items tended to be for non-substantive tasks such as traffic flagmen.

### Count I - Fraud in the Inducement

134.    Relator incorporates each paragraph of this complaint as if fully set forth herein.

135.    By all of the above, Defendants McHugh, Perdel, ASI, Perino, Lake, and Gould,

made and caused to be made material false statements to have the five prime contracts awarded

to McHugh. Each false statement used to obtain a contract, including each Schedule C, Schedule

D, and Disclosure Statement, as well as each bid, is a false claim in violation of the FCA, the

Whistleblower Reward and Protection Act, and the City of Chicago Ordinance 1-22-10 *et seq*.

136.    Moreover, due to the fraudulent inducement of the contracts, each claim for

payment thereunder is a false claim.

137.    Defendants, and each of them, are liable to the United States as well as to each

state entity approving and or supplying funds for the contracts for a penalty of $11,000 for each

false statement and for each false claim. Defendants are further liable, jointly and severally, for

treble damages.

29

## Count II - False Claims

138.     Relator incorporates each paragraph of this complaint as if fully set forth herein.

139.     By all of the above, Defendants McHugh, Perdel, ASI, Perino, Lake, Gould, Eichen, Krueger, Del Val Cura, and Bush made and caused to be made material false statements in order to claim DBE credit on McHugh's obligations and false claims for payment under the five prime contracts awarded to McHugh. Each false statement, including all pass through invoices and all DBE Contract Payment Status Reports violated of the FCA, the Whistleblower Reward and Protection Act, and the City of Chicago Ordinance 1-22-10 *et seq*.

140.     Defendants, and each of them, are liable to the United States as well as to each state entity approving and or supplying funds for the contracts for a penalty of $11,000 for each false statement and for each false claim. Defendants are also liable, jointly and severally, for treble damages.

## Count III - Relator's Personal Claims

141.     Relator incorporates each paragraph of this complaint as if fully set forth herein.

142.     After discovering that Relator was investigating the misconduct alleged above, Defendants Perino, ASI and Perdel threatened, harassed, and, ultimately terminated Relator in retaliation therefore and because he was reluctant to participate in the DBE fraud.

143.     The retaliation was done also at the behest of Defendants McHugh, Gould, and Del Val Cura in conspiracy with Perino, ASI and Perdel.

144.     Defendants' DBE violations contravened both federal and state public policy.

145.     Defendants' conduct violated the whistleblower protections in the FCA, state statute, and the City of Chicago's ordinances. It also constituted a retaliatory discharge in

violation of state public policy. Further, Defendants McHugh, Gould, and Keiser tortiously interfered in Mr. Keiser's employment with Perino, ASI and Perdel.

WHEREFORE, Relator, RYAN KEISER, respectfully prays that this Honorable Court enter judgment against Defendants JAMES McHUGH CONSTRUCTION Co., BRUCE LAKE, MICHAEL GOULD, MATHEW EICHEN, DAVID KRUEGER, CARLOS DEL VAL CURA, MATHEW BUSH, ACCURATE STEEL INSTALLERS, INC., PERDEL CONTRACTING CORPORATION, and ELIZABETH PERINO, awarding treble damages and penalties on Counts I and II and double lost wages as well as all additional compensatory damages and punitive damages on his personal claims, Count III. Relator further prays that the Court award him thirty percent of monies recovered on Counts I and II as well as attorneys fees and costs on all counts.

RESPECTFULLY SUBMITTED,

One of Counsel for Plaintiffs

Arthur Loevy
Michael Kanovitz
Jon Loevy
Tara Thompson
312 N. May St., Suite 100
Chicago, Il 60607
(312) 243-5900

31